## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| G.H., by and through his mother, C.H., Butler County, Ohio | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -vs- | : | **Case No.:** |
| | : | |
| SCOTT PARTIKA, in his official capacity as Director of the Ohio Department of Medicaid | : | **Judge:** |
| | : | |
| | : | |
| And | : | |
| | : | |
| KARA WENTE, in her official capacity as Director of the Ohio Department of Children and Youth | : | |
| | : | |
| | : | |
| And | : | **VERIFIED COMPLAINT FOR** |
| | : | **DECLARATORY AND INJUNCTIVE** |
| COLLEEN TUCKER, in her official capacity as Director of Ohio Family and Children First | : | **RELIEF** |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## INTRODUCTION

1. Plaintiff, G.H., a 14-year-old child, by and through his mother, C.H. (together as "Plaintiff"), brings this emergency action to prevent the Defendants from forcing C.H. to give up custody of her child in order to get G.H.'s medically necessary residential behavioral health treatment.

2. G.H. is currently hospitalized in an acute inpatient psychiatric unit solely because Defendants have denied funding for a less restrictive, medically appropriate placement at a Qualified Residential Treatment Program ("QRTP").

3. Defendants jointly administer the Multi-System Youth Custody Relinquishment Prevention Program ("MSY Program" or "MSY"), a program expressly designed to prevent families from having to relinquish custody of their children in order to obtain behavioral health treatment that would be paid for by the State if the child was in custody.

4. Despite the purpose of the MSY Program, Defendants have denied funding for G.H.'s medically necessary treatment in a QRTP without providing any hearing, appeal, or other due process and have informed C.H. that her only option to obtain treatment for G.H. is to relinquish custody of her son to the child welfare system.

5. Defendants' actions violate the Americans with Disabilities Act, the Rehabilitation Act, and the Due Process and Equal Protection Clauses of the United States Constitution, and place G.H. and his family at imminent risk of irreparable harm.

6. Plaintiff brings this action against the above-named Defendants in their official capacity, and Plaintiff seeks injunctive relief so that her son can receive essential health care without her having to give up her parental rights.

## **PARTIES**

7. Plaintiff G.H. is a 14-year-old boy whose permanent residence is with his siblings and parents in Butler County, Ohio. G.H. temporarily resides at the ██████████████

██████████████████████████████████████████

████

8. G.H. is filing this lawsuit by and through his mother, C.H., who resides in Butler County, Ohio.

9. Defendant Scott Partika is the Director of the Ohio Department of Medicaid with a principal business address located at 50 West Town Street, Suite 400, Columbus, Ohio

43215. The Ohio Department of Medicaid (ODM) is an agency of the State of Ohio responsible for supervising and administering Ohio's Medicaid program and implementing the rules outlined in the Social Security Act, section 1902(a)(5), 42 U.S.C. § 1396(a)(5). Defendant Partika has responsibility, authority, oversight, and control over all ODM programs, services, and operations, and is directly responsible for ensuring that all programs administered by ODM are operated and administered in compliance with federal law. Defendant Partika is also responsible for the Medicaid support of Ohio's Multi-System Youth Custody Relinquishment Prevention Program. The MSY Program was established to prevent custody relinquishment for youth with multi-system needs, and ODM is responsible for authorizing funding awarded by the MSY Program. A stated goal of the MSY Program is the prevention of custody transfer to child protection systems solely for the purpose of obtaining funding to access treatment.

10. Defendant Partika is being sued in his official capacity to remedy ongoing violations of federal law.

11. Defendant Kara Wente is the Director of the Ohio Department of Children and Youth (DCY) with a principal business address located at 246 North High Street, 8th Floor, Columbus, Ohio 43215. DCY is an agency of the State of Ohio responsible for overseeing and administering the delivery of children's services in the state. Director Wente has responsibility, authority, oversight, and control over all DCY programs and for ensuring they are operated in compliance with federal law. Defendant Wente is responsible for DCY's role in the MSY Program.

12. Defendant Wente is being sued in her official capacity to remedy ongoing violations of federal law.

13. Defendant Colleen Tucker is the Director of Ohio Family and Children First (OFCF) with a principal business address located at 246 North High Street, Columbus, Ohio 43215. OFCF is a Cabinet Counsel of Ohio tasked with helping families seek government services. ODM and DCY are both members of OFCF. Director Tucker is directly responsible for ensuring that Ohio's Family and Children First services are operated in compliance with federal law. Defendant Tucker is responsible for OFCF's role in the MSY Program.

14. Defendant Tucker is being sued in her official capacity to remedy ongoing violations of federal law.

## VENUE AND JURISDICTION

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (c)(2).

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that the action arises under the Constitution and laws of the United States. The Court has further jurisdiction under 28 U.S.C. § 1343.

## FACTUAL ALLEGATIONS
### G.H.'S Disabilities and Medical Need

17. Plaintiff G.H. is a 14-year-old boy who lives with his ████████ ████████████████████████████████████ ████████████ .

18. G.H. suffers from ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ .

4

19. As a result of these disabilities, G.H. experiences severe emotional dysregulation, aggression, suicidal ideation, and homicidal ideation toward family members. Some of these behaviors have existed since he was a young child.

20. In the summer of 2025, G.H.'s behaviors escalated, and his mental health needs intensified. On or around August 17, 2025, C.H. took G.H. to ███████████████████████ following an incident of aggression at home. The medical team started G.H. on psychiatric medication and referred him to ████████████ for a partial hospitalization program, an intensive out-patient program for mental health treatment.

21. On or around September 18, 2025, ████████████ discharged G.H. from their partial hospitalization program following a behavior incident and reported that they were unable to meet his current mental health needs.

22. On or around September 19, 2025, G.H. made threats to kill family members in his home. C.H. took him to the Emergency Department at ██████████████████████ to be assessed.

23. G.H. continued to express suicidal and homicidal ideation toward family members during the next month.

24. On or around October 13, 2025, G.H. threatened to kill an immediate family member. C.H. again took G.H. to ████████████ Emergency Department where G.H. explained in detail how he planned to kill that family member.

25. On or around the same day, ██████████████████████ admitted G.H. and he has remained inpatient in their psychiatric department since.

26. Over the last few weeks, G.H. has continued to report various detailed plans to kill his immediate family members, including his siblings.

27. G.H.'s treatment team at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has determined that continued inpatient hospitalization is no longer clinically appropriate, but that G.H. cannot safely return home.

28. G.H.'s treatment team has determined that residential treatment at a QRTP is medically necessary and represents the least restrictive, clinically appropriate setting for him at this time.

29. G.H.'s care coordination team from OhioRISE, the Medicaid managed care program covering G.H.'s mental and behavioral health treatment and services, completed a Child and Adolescent Needs and Strengths (CANS) Assessment, which indicated that treatment at a QRTP is the appropriate treatment setting for G.H.

30. The ▮▮▮▮▮▮▮▮ agreed to accept G.H. to their QRTP program. The agency currently has a bed open for G.H. and he can begin treatment there as soon as funding is secured.

## Ohio's Complicated Funding System for Children with Complex Behavioral Health Needs

31. The State of Ohio has created a multi-agency, complex system to provide medically necessary treatment for children with significant emotional and behavioral health problems who receive Medicaid.

32. The system fails to ensure that timely and stable, medically necessary services are available to children like G.H. who require residential treatment for their behavioral health needs.

33. Medicaid is a joint federal- and state-funded program authorized pursuant to the Medicaid Act, which provides medical assistance for certain low-income individuals. 42 U.S.C. §§ 1396 *et seq.*

34. Federal law requires states enrolled in the Medicaid program to provide certain medical assistance to people under the age of 21. 42 U.S.C. § 1396a(a)(43). Specifically, it requires

the coverage of all medically necessary treatment for people under 21. 42 U.S.C. § 1396d(r).

35. Federal law excludes federal Medicaid funding for "services in institutions for mental diseases," or IMDs. 42 U.S.C. § 1396d(a)(1). An IMD is a "hospital, nursing facility, or other institution of more than 16 beds, that is primarily engaged in providing diagnosis, treatment, or care of persons with mental diseases, including medical attention, nursing care, and related services." 42 U.S.C. § 1396d(i).

36. The exclusion of coverage for IMDs includes Qualified Residential Treatment Programs, or QRTPs, with more than 16 beds. *See* 42 U.S.C. § 1396d(a)(1), (i). QRTPs are programs that employ trauma-informed treatment models to address the clinical and other needs of children with serious emotional or behavioral disturbances. 42 U.S.C. § 672(k)(4).

37. Medicaid does provide coverage for inpatient residential psychiatric care for children under age 21 which includes services provided in accredited facilities known as Psychiatric Residential Treatment Facilities, or PRTFs, 42 U.S.C. § 1396(a)(16), (h); *see also* Ohio Admin. Code § 5122-41-02, even though PRTFs are more restrictive than QRTPs.

38. QRTPs, unlike PRTFs, require outreach and engagement with children's family members. 42 U.S.C. § 672(k)(4)(D).

39. The state covers the cost of room and board at PRTFs. Ohio Admin. Code § 5160-59-03.6(E)(1)(a).

40. In contrast, the state does not cover the cost of room and board at QRTPs. Federal law prohibits "federal financial participation" in the cost of room and board at QRTPs. 42 C.F.R. § 441.310(a)(2). Federal law, however, does not prohibit states from funding room

and board costs for QRTPs on their own. Ohio law does not explicitly prohibit the payment of room and board for QRTPs.

41. ODM funds only the medically necessary behavioral health treatment portion of childrens' treatment at QRTPs. Ohio Admin Code § 5160-1-14(C)(6).

42. To help families navigate the complex behavioral health landscape, Ohio created OhioRISE, an intensive Medicaid care management program within ODM designed to cover behavioral health treatment for children with complex behavioral health needs and assist children and their families through a care coordination team with accessing and coordinating appropriate medical treatment. *See* Ohio Admin. Code §§ 5160-59-01 to 5160-59-07.

43. OhioRISE can apply for funding to cover room and board at QRTPs through a state initiative called the Multi-System Youth Custody Relinquishment Prevention Program.

44. The MSY Program is funded by the Ohio legislature to fill gaps in coverage by the state's Medicaid system and to ensure that parents do not need to relinquish custody of their children to access medically necessary behavioral health treatment that would be paid for by the State if the child was in custody.

45. Many families, with the help of OhioRISE, apply for and utilize MSY funds to cover room and board at QRTPs. Without this funding, parents would have to give up custody of their children to the state to try to get them treatment in a QRTP.

46. When the MSY Program approves funds, it approves one to three months at a time, which may not be enough time for a child to complete a recommended course of therapeutic treatment.

47. The MSY Program is administered through a collaborative effort between ODM and OFCF. The Ohio Department of Children and Youth serves as the current administrative agent for the statewide OFCF.

48. The MSY Program does not allow families to appeal or request reconsideration of its decisions. If MSY denies an application, the family must start the process over again with a new application.

49. The MSY Program, therefore, holds extraordinary, unchecked power on the determination of whether children can access treatment at QRTPs.

50. As such, the MSY Program holds extraordinary, unchecked power on the determination of whether parents can keep custody of their children.

51. MSY funding functions as the almost exclusive means to medically necessary QRTP care for children not in the custody of a child welfare agency, making denial functionally equivalent to a denial of medically necessary services.

52. For the many families who are denied QRTP funding, they are left with an unfathomable choice: relinquish custody to the state in the hopes the local Public Children Services Agency (PCSA) will fund their child's treatment at a QRTP, or maintain custody and allow the child to return home before they are ready, an option that frequently leads to re-hospitalization, a regression of the child's health, and potential danger to siblings or other family members in the household.

**Defendants' Actions in Administering this Labyrinthine Medicaid Behavioral Health System Violates Plaintiff's Federal Rights**

53. G.H. receives Tier 3 Intensive Care Coordination (the most intensive tier) through OhioRISE.

54. As a Medicaid recipient, G.H. is entitled to coverage for all medically necessary services.

9

55. In November 2025, G.H.'s OhioRISE care coordination team applied for funding for residential treatment from the Post-Adoption Special Services Subsidy Program (PASSS) and the Multi-System Youth Custody Relinquishment Prevention Program after determining that residential treatment at a QRTP is medically necessary and the least restrictive clinical setting.

56. G.H. needs approved funding applications from both PASSS and MSY to be admitted to the ███████████ QRTP.

57. G.H.'s PASSS application was approved on December 17, 2025.

58. G.H.'s first MSY application was denied on November 24, 2025. Defendants provided no notice of appeal rights, no opportunity for a hearing, and no mechanism to contest or request reconsideration of the denial.

59. Defendant provided a list of recommended actions that Plaintiff could take prior to submitting another MSY application. Many of the actions had already been taken by G.H.'s OhioRISE care coordination team. Those that had not been taken were performative (e.g. an online parenting class), required weeks or even months to complete, could not be completed with G.H. hospitalized, and/or were not designed to ensure the safety of G.H. and his family in light of active and significant homicidal ideation by G.H.

60. A second MSY application was submitted on December 12, 2025. The second application addressed many of the recommended actions that Defendants had suggested when MSY denied G.H.'s first application.

61. On December 19, 2025, the undersigned discussed the MSY application with attorneys from the Ohio Department of Medicaid and provided additional information about the clinical need for G.H. to receive treatment in a QRTP.

62. The undersigned explained that many of the recommendations from the MSY committee were performative and did not reflect the seriousness of the situation.

63. On or about December 22, 2025, the Ohio Department of Medicaid requested additional information from ████████████████████████████████ about G.H.'s need for treatment in a QRTP. ██████████████████████ provided this information to the Ohio Department of Medicaid the next day, December 23, 2025.

64. However, G.H.'s MSY application was denied the morning of December 23, 2025. Defendants did not wait to review the additional information that they had requested from ████████████████████, and G.H. was not given notice of appeal rights or an opportunity for a hearing.

65. The undersigned was told that G.H. needed to submit a new MSY application in order for this additional information from ███████████████████ to be considered by the MSY Program.

66. A new MSY application was submitted by the OhioRISE care coordination team on December 30, 2025, and included even more updated information from ████████ ██████████. The application was denied on January 2, 2026, and G.H. was not given an opportunity to challenge the denial.

67. Because funding has been denied, G.H. must remain in an overly restrictive acute in-patient hospital setting against medical recommendation or return home against medical recommendation where he is a danger to himself and those around him.

68. G.H.'s treatment team and OhioRISE care coordination team have informed C.H. she could try to obtain residential behavioral health treatment for G.H. by relinquishing custody of

11

him to Butler County Children Services, the local child welfare agency, and see if they would pay for his necessary medical care at a QRTP.

69. Butler County Children Services has not agreed to take custody of G.H., nor agreed to pay for his required residential care.

70. Rather, Butler County Children Services has stated that if G.H. is discharged from the hospital and C.H. does not pick him up, they will bring neglect charges against C.H., placing her other children at risk of potentially being removed from her home.

71. Because G.H. continues to threaten to kill his siblings if he returns home, C.H. is placing her other children at risk of serious harm if G.H. returns home before receiving necessary treatment at a QRTP.

72. Defendants' actions have placed C.H. in an impossible position that the MSY Program was specifically designed to prevent: relinquish custody of her son or forgo him receiving medically necessary mental health treatment.

73. Plaintiff brings this complaint to ensure that G.H.'s medical needs are met without C.H. having to relinquish custody of G.H.

74. Plaintiff seeks a temporary restraining order requiring Defendants to fund G.H.'s medically necessary treatment at the ████████████ until such time as the Court may hear Plaintiff's request for an injunction and a declaration that Defendants' actions violate the Americans with Disabilities Act, the Rehabilitation Act, and the U.S. Constitution, as herein described.

## COUNT I:
### Violation of the Americans with Disabilities Act and Rehabilitation Act

75. Plaintiff incorporates the allegations in the previous paragraphs as though fully restated herein.

12

76. The Americans with Disabilities Act (ADA) prohibits discrimination on the basis of disability. 42 U.S.C. § 12132.

77. The Rehabilitation Act prohibits public entities and recipients of federal funds from discriminating against any individual by reason of disability. 29 U.S.C. § 794.

78. The implementing regulations for both the ADA and Section 504 of the Rehabilitation Act require that public and federally funded entities provide programs and activities "in the most integrated setting appropriate to the needs of the qualified individual with a disability." 28 C.F.R. § 41.51(d); 28 C.F.R. § 35.130(d).

79. Discrimination under the ADA includes "unjustified institutional isolation of persons with disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999); *see also* 42 U.S.C. § 12101(a).

80. Violation of the ADA can occur when a plaintiff has "been placed at serious risk of institutionalization or segregation." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460 (6th Cir. 2020).

81. At present, G.H. resides inpatient at ███████████████████. G.H.'s treating medical team and his OhioRISE care coordination have determined that a QRTP provides the appropriate level of medical care for G.H., and that additional therapeutic treatment at the ██████████████ would allow G.H. to safely transition back into the community.

82. The CANS Assessment completed by OhioRISE and used by ODM and OhioRISE care coordination teams to make decisions about treatment plans found that a residential placement like a QRTP was the appropriate level of care for G.H.

83. As outlined above, however, Defendants plan to return G.H. to the community before he is ready.

84. G.H.'s medical professionals believe that before returning to the community, G.H. needs treatment in a QRTP that will help him work on his behavioral health conditions and gradually reintegrate into his family and home. A lack of treatment in a QRTP puts G.H. at high risk of rapid deterioration of his mental health and he could pose a danger to himself, members of the community, or his own family.

85. G.H.'s return to the community before he is medically ready is extremely likely to result in another hospitalization.

86. Defendants, while ostensibly pushing G.H. into a less restrictive environment at home, are likely pushing G.H. back into hospitalization, a far more restrictive setting than a QRTP.

87. Defendants have failed to provide services to G.H. in the most integrated setting appropriate to his needs.

88. Federal law prohibits states from discriminating against individuals by pushing them into more restrictive environments than what are medically necessary.

89. The relief sought by G.H. would not require a fundamental alteration of Defendants' programs, services, or activities. Defendants designed the MSY program to provide the exact relief requested by G.H.—the funding of QRTPs and other programs to avoid custody relinquishment and unnecessary placement into more restrictive environments than what are medically necessary.

90. Defendants' failure to provide funding for care at a less-restrictive residential treatment facility violates G.H.'s rights under the ADA and Rehabilitation Act. 42 U.S.C. § 12101(a).

## COUNT II:
## Violation of the Fourteenth Amendment of the U.S. Constitution: Procedural Due Process

91. Plaintiff incorporates the allegations in the previous paragraphs as though fully restated herein.

14

92. The Fourteenth Amendment of the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

93. The Due Process Clause also provides individuals with the right to procedural due process when states adjudicate important rights, including statutory entitlements to public assistance. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

94. As outlined above, G.H. is statutorily entitled to medically necessary care under the federal and state Medicaid programs and has a protected property interest in Medicaid-related benefits and state-funded assistance for medically necessary care.

95. The denial of funding by the MSY Program for medically necessary treatment constitutes a state action adjudicating important rights provided through statutory entitlement.

96. However, when the MSY Program denied funding for G.H., it did so without providing an opportunity for a hearing.

97. Additionally, decisions about funding under the MSY Program are arbitrary. G.H.'s second MSY application addressed many of the recommended actions included with the denial of his first MSY application. Despite the inclusion of additional details explaining that many of the actions had been taken, the same list of recommended actions was included when his second MSY application was denied.

98. Additionally, during review of G.H.'s second MSY application, the MSY Program requested additional information about G.H.'s clinical need for treatment in a QRTP. However, before reviewing that information, Defendants denied his application.

99. G.H. then submitted a third application with even more information about his clinical need for QRTP treatment, but that application was also denied without an opportunity to appeal.

100. While acting under the color of law, Defendants structured and now implement an unconstitutional funding system that makes arbitrary decisions and, by refusing to grant G.H. a hearing or alternative appeals process, violate G.H.'s constitutional right to procedural due process. U.S. Const. amend. XIV, § 1

101. Defendants' violation of the U.S. Due Process Clause entitles Plaintiff to relief under 42 U.S.C. § 1983.

### COUNT III:
### Violation of the Fourteenth Amendment of the U.S. Constitution: Substantive Due Process

102. Plaintiff incorporates the allegations in the previous paragraphs as though fully restated herein.

103. The Fourteenth Amendment of the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

104. The Due Process Clause protects individuals' fundamental rights from interference by the state. *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942). One longstanding fundamental right is the right to family, or to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The State of Ohio has placed a unique emphasis on the fundamental right to have a family. *In re D.A.*, 113 Ohio St. 3d 88, 91 (2007).

105. Defendants have structured their behavioral health system in a manner that forces parents to give up custody of their children to get medical treatment, particularly when those children need residential treatment.

106. The right to have children, and to keep custody of those children, is a precious, fundamental right that has existed from the founding of this Nation. When governments infringe on this right, they must do so narrowly, and for a compelling reason.

107. Here, while Defendants have a compelling interest in creating an efficient system that governs the care of its residents with disabilities, nothing about this system is narrowly tailored to achieve these ends.

108. Defendants have not structured the system in a narrow, coherent way that balances the interests of children with disabilities with the interests of fiscal responsibility.

109. While acting under the color of law, Defendants' behavioral healthcare system has infringed upon G.H.'s fundamental right to family and invades C.H.'s fundamental right to have and raise children in violation of their substantive due process rights under the United States Constitution. U.S. Const., amend. XIV, § 1.

110. Defendants' violation of the U.S. Constitution entitles Plaintiff to relief under 42 U.S.C. § 1983.

**COUNT IV:**
**Violation of the Fourteenth Amendment of the U.S. Constitution: Equal Protection**

111. Plaintiff incorporates the allegations in the previous paragraphs as though fully restated herein.

112. The Fourteenth Amendment of the United States Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

113. As outlined above, Defendants treat children in custody of the child welfare system differently than they treats children in the custody of their own parents.

17

114. A child with severe behavioral health needs who is in the custody of the child welfare system can easily receive State funding, including the cost of room and board, so that they can receive medically necessary treatment in QRTP facilities.

115. However, children in the custody of their parents, such as G.H., are forced to attempt to navigate a labyrinthine and opaque funding system that lacks due process rights to get medically necessary services. While attempting to navigate this system, these children remain in overly restrictive inpatient psychiatric settings or are, against medical advice, discharged into the community where they risk decompensating to the point that they, once again, require restrictive inpatient psychiatric hospitalization. The families of children such as G.H.—who cannot live at home but do not need to be hospitalized—are left to pay out-of-pocket for expensive room and board costs, or to, more realistically, relinquish custody to the State in hopes that the State will pay those costs.

116. The Defendants' behavioral health system treats individuals in their parents' custody differently by paying for room and board only after custody is relinquished, and by arbitrarily punishing families who keep custody of their children with complex behavioral needs by refusing to pay for their need for residential treatment at QRTPs.

117. While Defendants may have a legitimate government interest in providing fiscally responsible medical care for children with disabilities, the system is not rationally related to that interest because it arbitrarily excludes and punishes children who are in the custody of their parents.

118. While acting under the color of law, Defendants' behavioral healthcare system arbitrarily punishes families who retain custody of their children in violation of the Equal Protection Clause of the U.S. Constitution. U.S. Const., amend. XIV, § 1.

119. Defendants' actions violate the Equal Protection Clause of the U.S. Constitution.

## COUNT V:
## Declaratory Judgment

120. Plaintiff incorporates the allegations in the previous paragraphs as though fully restated herein.

121. G.H. is entitled to a declaration that Defendants' MSY Program violates federal law.

122. G.H. is entitled to a declaration that Defendants have violated the Americans with Disabilities Act and the Rehabilitation Act with respect to their failure to fund G.H.'s placement at a QRTP. 42 U.S.C. § 12132; 29 U.S.C. § 794.

123. G.H. is entitled to a declaration that Defendants' failure to provide hearing rights to applicants upon adverse decisions by the MSY Program is a violation of his procedural due process rights under the Fourteenth Amendment of the U.S. Constitution.

124. G.H. is entitled to a declaration that Defendants' behavioral health system, which is pushing C.H. to relinquish custody of G.H, violates G.H.'s substantive right to due process under the Fourteenth Amendment of the U.S. Constitution.

125. G.H. is entitled to a declaration that the structure of Defendants' behavioral health system, which funds treatment for children in state custody but not treatment for children in the custody of their parents, is not rationally related to the government's interest and violates G.H.'s right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that under federal law the Court on his Complaint:

      A.    Enter judgment in Plaintiff's favor;

B.      Enter a temporary restraining order and preliminary injunction against Defendants that would prohibit C.H. from having to give up custody of G.H. so that he can access residential treatment and avoid a serious risk of institutionalization;

C.      Enter a temporary restraining order and preliminary injunction requiring Defendants to fund G.H.'s QRTP placement;

D.      Grant injunctive relief requiring Defendants to provide notice and the right to a hearing after denial of assistance under Ohio's MSY Program;

E.      Grant declaratory relief to the Plaintiff declaring that the actions and inactions of the Defendants violate Plaintiff's rights under the ADA, the Rehabilitation Act, the Due Process clause, and the Equal Protection clause;

F.      Award Plaintiff the costs of this action, including reasonable attorney fees; and

G.      Award such other declarative, injunctive, or equitable relief as may be just and equitable.

Respectfully submitted,

s/ Rachel E. Barr
Rachel E. Barr, Trial Attorney (0098031)
Phillip Rich (0102679)
Stephanie A. Moes (0077136)
Legal Aid Society of Southwest Ohio, LLC
215 E. 9th Street, Suite 500
Cincinnati, OH 45202
Telephone: (513) 362-2869
Facsimile: (513) 241-1187
rachelbarr@lascinti.org
philrich@lascinti.org
stephaniemoes@lascinti.org

20

s/ Regina Campbell
Regina Campbell (0067291)
Sarah Jana (0104712)
Legal Aid Society of Greater Cincinnati
215 E. 9th Street, Suite 200
Cincinnati, OH 45202
Telephone: (513) 362-2810
Facsimile: (513) 241-6800
reginacampbell@lascinti.org
sarahjana@lascinti.org


*Trial Attorneys for Plaintiff*

21

## VERIFICATION PAGE

State of Ohio
County of _Butler_

    I, C.H., being duly sworn according to law, hereby attest as follows:

    I am the duly appointed legal custodian of G.H., a minor child, who is the subject of the foregoing Verified Complaint for Declaratory and Injunctive Relief. The factual allegations set forth in the foregoing Verified Complaint are true and accurate to the best of my knowledge and belief.

                                                      _____

                                                      C.H.

Sworn to me and subscribed in my presence this 5th day of January 2026

Jennifer Junker
Notary Public, State of Ohio
My Commission Expires:
03/29/2026

_____
Notary Public

My commission expires: _3/29/26_